Docket No. 107002.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

*In re* I.H. *et al*., Minors (The People of the State of Illinois,
Appellant, v. Jacqueline M., Appellee).

*Opinion filed October 21, 2010.*

JUSTICE BURKE delivered the judgment of the court, with
opinion.

Chief Justice Fitzgerald and Justices Thomas, Kilbride, Garman,
and Karmeier concurred in the judgment and opinion.

Justice Freeman dissented, with opinion.

## OPINION

Section 2–18(4)(c) of the Juvenile Court Act of 1987 requires
corroboration and cross-examination of a minor's previous statements
relating to allegations of abuse or neglect. 705 ILCS 405/2–18(4)(c)
(West 2006). At issue in this appeal is whether this provision applies
to temporary custody hearings.[1] The appellate court determined that

---

[1]For purposes of this appeal, the term "temporary custody hearing" is
synonymous with the term "shelter care hearing." Because the Act identifies
this proceeding as a temporary custody hearing (705 ILCS 405/2–10 (West
2006)), we use that term here.

it does and ultimately reversed the trial court's adjudication of neglect, concluding it was against the manifest weight of the evidence. 382 Ill. App. 3d 1093, 1102.

We reject the appellate court's conclusion that section 2–18(4)(c) of the Act applies to temporary custody hearings. However, we affirm the judgment of the appellate court on other grounds.

## BACKGROUND

Respondent Jacqueline M. is the mother of the minors I.H. and M.H. In September 2006, the minors' maternal grandmother brought four-year-old M.H. to the Mundelein police department to report that Jorge G., Jacqueline's live-in boyfriend, had sexually abused M.H. Law enforcement officials reported M.H.'s allegations to the telephone hotline of the Department of Children and Family Services (DCFS). Three days later, DCFS took the minors into temporary custody.

The State filed petitions for adjudication of wardship as to both minors alleging that the minors were neglected because they had been exposed to an injurious environment (705 ILCS 405/2–3(1)(b) (West 2006)) and that they were abused because they faced a substantial risk of physical injury (705 ILCS 405/2–3(2)(ii) (West 2006)). The petition related to M.H. additionally alleged that she was abused because she had been physically injured (705 ILCS 405/2–3(2)(i) (West 2006)) and because her mother had allowed a sex offense to be committed against her (705 ILCS 405/2–3(2)(iii) (West 2006)).

At the temporary custody hearing, the State presented the testimony of Robert Musial, the DCFS caseworker assigned to the family. According to Musial, a Mundelein police department report stated that Detective Katie Smith interviewed M.H. at the police station. In that interview, M.H. stated that on four separate occasions Jorge had touched or penetrated her "pochita," identified by M.H. on a body chart as her vaginal area. M.H. reported that Jorge's actions were painful and that she saw something red in her underwear after one of the incidents. In addition, M.H. described an incident when Jorge came up from behind her and whispered into her ear, "Where's your pochita?" Law enforcement officials reported M.H.'s allegations to the DCFS hotline, and DCFS opened an investigation.

Musial further testified based on notes prepared by DCFS investigator Robert Schnabel. Schnabel spoke to Jacqueline through a Spanish interpreter at a hospital where I.H. was receiving medical care for an injured arm. Schnabel informed Jacqueline of M.H.'s sexual abuse allegations and instructed her that Jorge should not have any contact with M.H. or I.H. Schnabel's report indicated that Jacqueline agreed to the safety plan to keep the children from having contact with Jorge during the investigation.

Musial later learned from a hospital worker that Jacqueline, Jorge, and M.H. were visiting I.H. at the hospital. Musial contacted the police department, then called the hospital and learned that Jacqueline, Jorge, and M.H. had left. The next day, Musial received a call from the hospital reporting that Jacqueline, Jorge, and M.H. were at the hospital. Musial went to the hospital and spoke to Jacqueline. The conversation was interpreted through a hospital interpreter who was available through a telephone conference call. Jacqueline initially acted surprised when Musial questioned her about M.H.'s allegations. After Musial explained the nature of the allegations and mentioned Jacqueline's previous discussion with Schnabel, Jacqueline gave Musial her attorney's business card and told Musial she would not talk to him without her attorney present. Musial then contacted Jacqueline's attorney, who declined to advise Jacqueline to prevent Jorge from having contact with her children.

Musial again spoke to Jacqueline. This second conversation was interpreted by Jacqueline's friend Rosa. Jacqueline told Musial she was taking her children to Jorge's apartment. Musial admonished her not to take her children to Jorge's apartment while the investigation was pending. Jacqueline could not provide an exact street address where she would be staying with her children and refused to provide Musial with a contact telephone number. Musial asked her if she would agree to place M.H. and I.H. with a family member, but Jacqueline said she did not want her children to stay with any family member. According to Musial, Jacqueline did not believe that M.H.'s allegations were truthful and, instead, believed that the grandmother had fabricated the allegations. On cross-examination, Musial acknowledged that M.H. had reported that Jorge sexually abused her in January 2006, but that those allegations were ultimately determined to be "unfounded." Musial testified that M.H. was currently scheduled

to undergo a sexual abuse examination.

Following closing arguments, the trial court found probable cause to believe that M.H. and I.H. were abused and neglected, finding that M.H. had alleged that Jorge sexually abused her on four separate occasions, her allegations were specific, I.H. lived in the same home, and Jacqueline refused to cooperate with the safety plan. The court further found that immediate and urgent necessity existed to remove the minors from their home and place them in shelter care, that reasonable efforts had been made to prevent their removal, and that shelter care was consistent with the minors' health, safety, and best interests. The court granted temporary guardianship to DCFS and temporary custody to the minors' grandmother.

The State later amended the petitions for adjudication of wardship to include an additional allegation that the minors were neglected based on an injurious environment in that the mother violated the safety plan by allowing contact between the minors and Jorge.

Prior to the adjudicatory hearing, Jacqueline filed a motion *in limine* to exclude any out-of-court statements made by M.H. to Detective Smith on the basis that those statements alone, absent corroboration or being subject to cross-examination, were insufficient to support a finding of neglect or abuse. The trial court denied Jacqueline's motion.

At the adjudicatory hearing, Detective Smith, DCFS investigator Schnabel, and DCFS caseworker Musial testified for the State. Their testimony was consistent with the evidence presented at the temporary custody hearing. In addition, Musial testified that a medical examination of M.H. did not indicate sexual abuse. Both Schnabel and Musial testified that the DCFS file contained a written safety plan. However, although the record contains a DCFS report describing the safety plan and indicating that Jacqueline agreed to the plan, there is no written safety plan with Jacqueline's signature in the record.

At the close of the State's case in chief, the trial court granted Jacqueline's motion for a directed finding that the State had failed to prove the underlying sexual abuse allegations by a preponderance of the evidence. Accordingly, the trial court dismissed the counts in both petitions that alleged the minors were neglected and abused based on the sexual abuse allegations. The court entered an order adjudicating

the minors neglected, however, on the ground that Jacqueline failed to abide by the terms of the safety plan. The trial court subsequently entered a dispositional order adjudicating M.H. and I.H. neglected, making them wards of the court, and naming DCFS as their legal guardian.

On appeal, Jacqueline challenged the trial court's findings at the temporary custody hearing, arguing that the State failed to establish probable cause for the implementation of a safety plan. She argued that the safety plan was based solely on M.H.'s statements, which were neither corroborated nor subject to cross-examination, in violation of section 2–18(4)(c) of the Juvenile Court Act of 1987 (705 ILCS 405/2–18(4)(c) (West 2006)). Jacqueline also challenged the adjudication of neglect on the grounds that the State failed to prove the existence of a safety plan, that Jacqueline understood the plan, or that she violated the safety plan.

The appellate court rejected the State's argument that the sufficiency of the evidence at the temporary custody hearing was moot because there was no relief available to the mother regarding the temporary custody hearing. 382 Ill. App. 3d at 1100. The court held that the appeal was not moot because the mother had identified the reversal of the adjudication of neglect as the effectual relief that would cure error in the temporary custody hearing.[2] On the merits, the appellate court concluded that the probable cause determination at the temporary custody hearing was not supported by the evidence. Specifically, M.H.'s statements were uncorroborated and not subject to cross-examination. 382 Ill. App. 3d at 1098-99. In reaching its conclusion, the appellate court relied on section 2–18(4)(c), requiring that a minor's statements alleging sexual abuse be subject to cross-examination and corroboration if used to support a finding of abuse or neglect. 705 ILCS 405/2–18(4)(c) (West 2006). The court noted that the court in *In re M.B.*, 241 Ill. App. 3d 697, 706 (1992), applied section 2–18(4)(c)'s evidentiary requirement to a temporary custody hearing. 382 Ill. App. 3d at 1099.

Next, the appellate court reversed the order adjudicating the minors neglected, finding that "the [trial] court's adjudication of

---

[2]The State does not argue this point on appeal to this court.

neglect was based entirely on a finding that respondent had failed to keep the minors away from Jorge as directed by the safety plan, even though the defects in the shelter-care hearing meant that there was insufficient evidence of sexual abuse to warrant imposing the plan in the first place." 382 Ill. App. 3d at 1101-02. The court did not address the remaining arguments raised by Jacqueline challenging the adjudication of neglect.

We allowed the State's petition for leave to appeal. See 210 Ill. 2d R. 315. We granted leave for the Cook County public guardian and Cook County State's Attorney to file *amicus curiae* briefs. 155 Ill. 2d R. 345.

ANALYSIS

The issue in this case is whether the evidentiary limitation in section 2–18(4)(c) of the Act applies to temporary custody hearings. This issue presents a question of statutory construction, which we review *de novo*. *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 332 (2008). The cardinal rule of statutory construction is to determine and give effect to the legislature's intent. *Abruzzo*, 231 Ill. 2d at 332. The legislature's intent is best indicated by giving the statutory language its plain and ordinary meaning. *Abruzzo*, 231 Ill. 2d at 332. To determine the plain meaning, we must consider the statute in its entirety and be mindful of the subject it addresses, as well as the legislature's intent in enacting the statute. *Orlak v. Loyola University Health System*, 228 Ill. 2d 1, 8 (2007).

The State contends the evidentiary limitation in section 2–18(4)(c) applies to adjudicatory hearings but not to temporary custody hearings. The State's construction of the statute is supported by the plain language of the statute as well as the overall framework of article II of the Act. Sections 2–18(2), (3), (5), (6) of the Act list various types of evidence that are admissible or that constitute *prima facie* evidence of abuse or neglect "[i]n any hearing under this Act." 705 ILCS 405/2–18(2), (3), (5), (6) (West 2006). By contrast, section 2–18(4) describes evidence that is admissible but does not specify the type of hearing at which that evidence is applicable. 705 ILCS 405/2–18(4) (West 2006). Section 2–18(4)(c), the provision at issue in this case, provides:

"Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support *a finding of abuse or neglect.*" (Emphasis added.) 705 ILCS 405/2–18(4)(c) (West 2006).

The plain and ordinary meaning of the language in section 2–18(4)(c) requires corroboration and cross-examination of a minor's previous statements alleging abuse or neglect only when those statements are used as the sole basis for a *finding of abuse or neglect.* 705 ILCS 405/2–18(4)(c) (West 2006). A trial court does not, however, make a *finding* of abuse or neglect at a temporary custody hearing.

Section 2–10 governs temporary custody hearings, which must take place within 48 hours of the minor's protective custody. At the hearing, "all witnesses present shall be examined before the court in relation to any matter connected with the allegations made in the petition." 705 ILCS 405/2–10 (West 2006). Unlike section 2–18, there is no language in section 2–10 restricting the testimony of the witnesses to require corroboration or cross-examination. The trial court must determine whether there is "probable cause to believe that the minor is abused, neglected or dependent." 705 ILCS 405/2–10 (West 2006). If the court finds no probable cause, the court shall release the minor and dismiss the petition. 705 ILCS 405/2–10(1) (West 2006). If the court finds probable cause, it must hear evidence and determine whether it is consistent with the health, safety, or best interests of the minor that the minor be released to his parents or placed in shelter care. 705 ILCS 405/2–10(2) (West 2006). The court may place the minor in shelter care if the court finds it "a matter of immediate and urgent necessity for the safety and protection of the minor" and that "reasonable efforts have been made or that, consistent with the health, safety and best interests of the minor, no efforts reasonably can be made to prevent or eliminate the necessity of removal of the minor from his or her home." 705 ILCS 405/2–10(2) (West 2006). A temporary custody hearing is similar to both a probable cause hearing and a temporary detention hearing under section 5–501(2) of the Act (705 ILCS 405/5–501(2) (West 2002)). *In re Austin D.*, 358 Ill. App. 3d 794, 801 (2005), citing *In re L.M.*,

189 Ill. App. 3d 392, 395 (1989) (referring to the temporary custody hearing as a "probable cause hearing"). Essentially, the purpose of the hearing is to determine whether a minor requires temporary placement outside the home. *Austin D.*, 358 Ill. App. 3d at 801, citing *In re W.B.*, 213 Ill. App. 3d 274, 283 (1991).

It is not until the adjudicatory hearing that the trial court makes an actual "finding" of abuse or neglect. See 705 ILCS 405/2–21 (West 2006); *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004) ("Following placement of a child in temporary custody, the circuit court must make a finding of abuse, neglect or dependence before it conducts an adjudication of wardship"). The State has the burden of proving the allegations of neglect by a preponderance of the evidence. *Arthur H.*, 212 Ill. 2d at 464.

In our view, this distinction is dispositive of the issue on appeal. A finding of probable cause is not equivalent to a "finding" on the merits of abuse, neglect, or dependency. The trial court issues no finding of abuse or neglect at a temporary custody hearing, and section 2–18(4)(c)'s evidentiary limitation applies only when the minor's statements alone are used to support a finding of neglect or abuse. At a temporary custody hearing, the trial court only considers whether probable cause exists to believe the minor is abused or neglected. 705 ILCS 405/2–10 (West 2006). Simply put, section 2–10 of the Act governs temporary custody hearings and does not require the trial court to making a finding of abuse or neglect. See 705 ILCS 405/2–10 *et seq*. (West 2006) (detailing requirements for temporary custody hearings). Consequently, we find that the evidentiary limitation of section 2–18(4)(c) is inapplicable to temporary custody hearings.

The framework for juvenile court proceedings in the Act further supports our conclusion. We construe statutes as a whole, evaluating each provision in connection with every other section of the statute. *People ex rel. Department of Public Aid v. Smith*, 212 Ill. 2d 389, 404 (2004). Article II of the Act sets forth the procedures for proceedings concerning abused, neglected, or dependent minors. 705 ILCS 405/2–1 (West 2006). Upon the filing of a petition for wardship from the State, a minor who has been taken into temporary protective custody must be brought before a judicial officer within 48 hours for a temporary custody hearing. 705 ILCS 405/2–9(1) (West 2006). If

the minor is not brought before a judicial officer within the 48-hour period, the minor must be released from temporary custody at the expiration of the 48-hour period. 705 ILCS 405/2–9(3) (West 2006).

Within 90 days of service of an abuse or neglect petition under the Act, the trial court must conduct an adjudicatory hearing. 705 ILCS 405/2–14(b) (West 2006). "At the adjudicatory hearing, the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2–18(1) (West 2006). If the trial court makes a finding that the minor is abused or neglected, it then must hold a dispositional hearing within 30 days to determine whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/2–21(1), (2) (West 2006).

We agree with the State that this framework demonstrates the legislature intended the temporary custody hearing as preliminary in nature with a focus on the necessity of removal for the immediate protection of the minor. Because the temporary custody hearing must occur within 48 hours of a minor being taken into protective custody, little time is available for obtaining corroborating evidence of the minor's statements. The statute does not allow a continuation of the hearing, unlike section 2–14(c) (705 ILCS 405/2–14(c) (West 2006)), which provides for a continuation of the adjudicatory hearing under certain circumstances. Based on the plain language of the statute, the legislature did not intend to extend section 2–18(4)'s corroboration and cross-examination requirement to temporary custody hearings under section 2–10. Under the express language of section 2–18(4)(c), those additional evidentiary requirements apply only at the later adjudicatory hearing when making abuse and neglect findings.

Despite the plain language of the statute, the appellate court in the case at bar relied on the holding in *In re M.B.* to conclude that section 2–18(4)(c) applies to temporary custody hearings. 382 Ill. App. 3d at 1099, citing *In re M.B.*, 241 Ill. App. 3d 697 (1992). That reliance is misplaced because the holding in *In re M.B.* is based on a flawed analysis of the statute. Moreover, no other court has relied on *In re M.B.* for that conclusion.

In *In re M.B.*, DCFS filed petitions for adjudication of wardship alleging that the minors, S.B., M.B., and J.B., were neglected due to an injurious environment. The petition concerning S.B. also contained

allegations of sexual abuse, and the petition concerning J.B. contained additional allegations of physical abuse. *In re M.B.*, 241 Ill. App. 3d at 699. At the temporary custody hearing, Diane Phillips, a DCFS child welfare supervisor, testified that she had spoken with Dr. Antonio Blanco, a psychiatrist who treated J.B. According to Blanco, J.B. told him about instances of physical and sexual abuse perpetrated by his father against all three children. Philips further testified that J.B.'s counselor, Jerome Anderson, told her that J.B. had spoken of his father's membership in a cult, whose members "made him do things." At the hearing, the trial court allowed S.B. and J.B. to be questioned, *in camera*, by their guardian *ad litem*. The minors denied being physically or sexually abused. At the conclusion of the hearing, the trial court found that no probable cause existed to warrant the minors' placement in temporary custody and dismissed the petitions. On appeal, the mother argued that the finding of no probable cause was against the manifest weight of the evidence. The appellate court affirmed. *In re M.B.*, 241 Ill. App. 3d at 699. The court held that J.B.'s previous statements to Dr. Blanco and to Anderson did not constitute sufficient evidence to establish probable cause. The court found that, under section 2–18(4)(c), the statements were not corroborated and neither Blanco nor Anderson was subject to cross-examination. *In re M.B.*, 241 Ill. App. 3d at 706.

The *In re M.B.* court's conclusion is not supported by the language in section 2–18(4)(c) of the Act. The court applied the statute to the doctor's and counselor's statements rather than to the minor's statements. The statute applies to the statement of the *minor* and whether that statement is corroborated or the *minor* is present to testify. Indeed, the minor did testify at the hearing through an *in camera* interview.

Furthermore, the *In re M.B.* court did not analyze the propriety of applying section 2–18(4)(c)'s evidentiary limitation to temporary custody hearings, instead simply citing to *In re Marcus E.*, 183 Ill. App. 3d 693 (1989). *In re M.B.*, 241 Ill. App. 3d at 706. *In re Marcus E.*, however, was an appeal solely from an adjudication hearing and made no mention of the admissibility of a minor's prior statement at the temporary custody hearing. See *In re Marcus E.*, 183 Ill. App. 3d at 701-02. In *In re Marcus E.,* the parents challenged the evidence supporting the trial court's finding after an adjudicatory hearing that

their two children had been abused and subjected to an injurious environment. *In re Marcus E.*, 183 Ill. App. 3d at 702-03. The appellate court concluded that "[o]n its face the statute provides that out-of-court statements will not support a finding of abuse if 'uncorroborated and not subject to cross-examination.' " *In re Marcus E.*, 183 Ill. App. 3d at 704, quoting Ill. Rev. Stat. 1983, ch. 37, par. 704–6(4)(c) (now 705 ILCS 405/2–18(4)(c) (West 2008). Noting that the statute did not allow a minor's hearsay statements to be the sole basis for a finding of abuse, the court concluded that "the children's out-of-court statements may be used only in conjunction with corroborative evidence to support a finding of abuse." *In re Marcus E.*, 183 Ill. App. 3d at 705.

The conclusion in *In re Marcus E.* that the statutory evidentiary limitation applies to a *finding of abuse after an adjudication hearing* is consistent with our interpretation of section 2–18(4)(c). Consequently, we find that *In re Marcus E.* does not support the appellate court's decision in this case or in *In re M.B.*, to apply section 2–18(4)(c)'s evidentiary limitation to temporary custody hearings. Therefore, we overrule *In re M.B.*'s application of section 2–18(4)(c) to temporary custody hearings.

We recognize the appellate court's concern that, without the evidentiary safeguard in section 2–18(4)(c), "a flimsy allegation of abuse could be the basis for instituting an onerous safety plan, the noncompliance with which could trigger an adjudication of neglect, which is very serious." 382 Ill. App. 3d at 1101. We disagree, however, with the appellate court's related conclusion that the "trial court's probable cause determination [at the temporary custody hearing] was the foundation on which any safety plan could be built." 382 Ill. App. 3d at 1101. Section 2–10 requires the trial court to determine not only probable cause, but also whether removal is a matter of immediate and urgent necessity and whether DCFS made reasonable efforts to prevent removal of the child or whether no efforts reasonably could be made to prevent the child's removal. 705 ILCS 405/2–10(2) (West 2006). Thus, the trial court must consider whether implementing a reasonable safety plan could eliminate the need to remove a child from the parent. Contrary to the appellate court's suggestion, if a proposed safety plan is unreasonable or unduly onerous, the trial court may refuse to remove the child from the home

whether or not the parent agrees to comply with the plan.

We are ever mindful that under the Act, "[t]he best interests of the child is the paramount consideration to which no other takes precedence." *In re Austin W.*, 214 Ill. 2d 31, 46 (2005). Even though this approach may result in removal of the minor at the onset of an investigation, as here, it is certainly reasonable for the legislature to err on the side of protecting minors from abuse and neglect during the preliminary stages of an investigation. This is particularly true when the Act mandates a temporary custody hearing within only 48 hours of taking a minor into protective custody following an allegation of abuse or neglect.

Finally, we note that the State, in its brief to this court, has stated that it is seeking "reversal only of the appellate court's legal holding that the evidentiary limitation in section 2–18(4)(c) of the Act applies to temporary custody hearings, and does not challenge the appellate court's decision to vacate the adjudication of neglect based upon the facts of this specific case." Because the State is challenging the sole rationale relied upon by the appellate court in reaching its judgment and, at the same time, asserting that the judgment of the appellate court should be affirmed, we construe the State's position as a concession of error with respect to other arguments that were raised by the mother before the appellate court but not reached in the appellate court's opinion. Specifically, we understand the State's position to be a concession that "the State failed to prove that a safety plan existed, that respondent understood it, or that respondent violated it." 382 Ill. App. 3d at 1098. Based on our review of the record, we agree with and accept the State's concession. Our acceptance of the State's concession means that the judgment of the appellate court must be affirmed. See, *e.g.*, *People v. Brooks*, 233 Ill. 2d 146, 157 (2009).


CONCLUSION

We hold that section 2–18(4)(c) of the Act, requiring corroboration and cross-examination of a minor's previous statements relating to allegations of abuse or neglect, does not apply to temporary custody hearings. To the extent the appellate court applied section 2–18(4)(c) to a temporary custody hearing, we overrule that

portion of *In re M.B.*, 241 Ill. App. 3d 697 (1992).

The judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE FREEMAN, dissenting:

The majority holds that the provision contained in section 2–18(4)(c) of the Juvenile Court Act of 1987 (705 ILCS 405/2–18(4)(c) (West 2006)) requiring a minor's statements to be corroborated and cross-examined is inapplicable to temporary custody proceedings. I believe that my colleagues have improperly reached this issue. It is my view that leave to appeal in this matter was improvidently granted, and that this appeal should be dismissed.

In order to fully grasp the error of the majority, focus must be directed to the procedural history of this case. At the close of the State's case in chief at the adjudicatory hearing, counsel for the minors' mother–Jacqueline M.–moved for a directed finding that the State had failed to prove by a preponderance of the evidence that M.H. had been a victim of sexual abuse. The circuit court granted the motion and dismissed the counts in the petitions for adjudication of wardship that alleged the minors were neglected and abused based upon the sexual abuse allegations. The circuit court, however, entered an order adjudicating the minors neglected based upon Jacqueline's alleged failure to comply with the directive to keep the minors away from Jacqueline's live-in boyfriend, Jorge G. Jacqueline thereafter filed a motion to reconsider. The circuit court denied that motion and subsequently entered a dispositional order, making the minors wards of the court and awarding DCFS legal guardianship.

On appeal, Jacqueline challenged the adjudication of neglect on two grounds. First, she asserted that the temporary custody order on which the adjudication was based was improper because M.H's out-of-court statements were not subject to cross-examination and the State failed to present evidence to corroborate the report of abuse. Accordingly, she asserted that there was no probable cause to grant temporary custody to DCFS and to implement a safety plan. Second, Jacqueline argued that the circuit court erred in adjudicating the minors neglected based upon her alleged violation of a DCFS safety

-13-

plan, as the State failed to prove that a safety plan existed, that she understood it, or that it was violated.

The appellate court agreed with Jacqueline and reversed the judgment of the circuit court. The court held that the State failed to prove at the adjudicatory hearing that Jacqueline neglected the minors by violating the DCFS no-contact directive. The court noted that the sole basis for implementing that directive was the allegation, based upon M.H.'s out-of-court statements, that Jorge sexually abused her, "even though the defects in the shelter-care hearing meant that there was insufficient evidence of sexual abuse to warrant imposing the plan in the first place." 382 Ill. App. 3d at 1101. The court explained that because M.H.'s hearsay statements introduced at the temporary custody hearing were neither corroborated nor subject to cross-examination pursuant to section 2–18(4)(c) of the Juvenile Court Act, they were insufficient to support the probable cause finding of abuse and neglect. 382 Ill. App. 3d at 1100. The court further noted that its ruling was consistent with the 1992 decision in *In re M.B.*, 241 Ill. App. 3d 697 (1992), which held that section 2–18(4)(c) of the Juvenile Court Act applied to temporary custody hearings as well as adjudicatory hearings. 382 Ill. App. 3d at 1099.

In addition, the appellate court observed that, in finding neglect, the circuit court focused solely upon Jacqueline's noncompliance with the plan, regardless of the reasons for instituting it. The appellate court concluded:

> "If we were to adopt the State's position [that the statute did not apply], a flimsy allegation of abuse could be the basis for instituting an onerous safety plan, the noncompliance with which would trigger an adjudication of neglect, which is very serious. While the best interests of the minors is paramount, adjudicating [the minors] neglected based on respondent's noncompliance with an unfounded safety plan prejudiced respondent and the family as a whole." 382 Ill. App. 3d at 1101-02.

Although the State took the position before the appellate court that the issue of awarding DCFS temporary custody was moot, the court disagreed, and, in any event, believed that the issue could be reached under the public interest exception to the mootness doctrine. 382 Ill. App. 3d at 1100. Accordingly, the appellate court reversed the

circuit court's order adjudicating the minors neglected.

In its petition for leave to appeal to this court, the State asserted that while it did "not seek a reversal of the appellate court's judgment in this case," it nevertheless sought review of the court's reasoning "because the appellate court reached a moot issue under the public interest exception and, in so doing, misguided the lower courts in their application of section 2–18(4)(c) of the Act." The State's petition then listed two points for reversal: (1) that the appellate court's application of section 2–18(4)(c) to a temporary custody hearing was contrary to the language and purpose of the Juvenile Court Act; and (2) that the appellate court's ruling that the neglect adjudication did not render the temporary custody hearing moot was erroneous. In addition to reversal of that portion of the appellate opinion which discussed section 2–18(4)(c), the State also requested, in the alternative, that this court exercise its supervisory authority to vacate that portion of the appellate court's opinion.

After we granted the State's petition for leave to appeal, the State's subsequent brief to this court again asserted that it was "seek[ing] reversal only of the appellate court's legal holding that the evidentiary limitation in section 2–18(4)(c) of the [Juvenile Court] Act applies to temporary custody hearings," and that "[t]he People do not challenge the rest of the appellate court's decision, which vacated the finding of neglect for [I.H.] and [M.H.]." I further note, however, that although the State raised the issue of mootness in its petition for leave to appeal in relation to its challenge of the appellate court's reasoning, in its brief to this court the State does not argue–much less mention–mootness in any context. In addition, the State abandoned its call for the alternative relief requested in its petition, and now asks that the holding of the appellate court regarding section 2–18(4)(c) be vacated.

As a direct result of the State's unorthodox position in this appeal, *i.e.*, that it is not challenging the judgment of the appellate court, Jacqueline has not participated in the instant action. Subsequent to the State's filing of its brief, Jacqueline's counsel informed this court, in a letter dated December 23, 2008, that "[b]ecause the State is not challenging the status of my client in the appeal, she has chosen not to proceed with arguments in this cause." I note that this critical fact is conspicuously absent from the majority opinion.

-15-

Although we granted the State's petition for leave to appeal, my colleagues do not consider the fundamental threshold issue of whether this appeal has been improvidently granted. The position taken by the State is in direct conflict with the long-settled principle that we review the *judgment* of the appellate court, regardless of its rationale. *People v. Durr*, 215 Ill. 2d 283, 296 (2005). In addition, because the State as appellant is not challenging the judgment of the appellate court–the only proper subject of our review–we cannot provide meaningful relief, and any decision rendered in this matter is essentially advisory in nature. See *In re Mary Ann P.*, 202 Ill. 2d 393, 401 (2002). Traditionally, this court avoids rendering advisory opinions. *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 157 (2002).

The majority's acceptance of the State's challenge solely to the *rationale* underlying the judgment of the appellate court and *not* to the *judgment* itself is a dramatic departure from our well-settled procedure, which not only draws into question the appropriate manner in which to petition for leave to appeal to this court, but also invites an element of gamesmanship to be injected into this process by allowing an appellant to pursue a strategy whereby that party does not contest the judgment below, but, for whatever hidden reason, seeks only to overturn a rationale within the case.

The potentially negative results flowing from the majority's acceptance of this approach are evident in the instant appeal. The majority's opinion on this important issue of statutory construction is based upon its consideration of the arguments of only one side in this case, which is a direct result of the State's decision to divorce the appellate court's judgment from its reasoning, and to challenge only the latter, not the former. I submit that one-sided arguments are an inevitable outgrowth of the majority's endorsement of the State's departure from conventional procedure.[3] Accepting a petition for

---

[3]In contrast, I note that the United States Supreme Court does not entertain one-sided argument in cases wherein it has granted *certiorari*. Pursuant to its custom and practice, the Court appoints attorneys to act as *amicus curiae* to brief and argue a case pending before it to ensure that both sides of a case are represented and that both sides of the argument are heard. See, *e.g.*, *Toibb v. Radloff*, 501 U.S. 157, 160 n.4, 115 L. Ed. 2d 145, 150 n.4, 111 S. Ct. 2197, 2199 n.4 (1991) (where the named respondent declined

leave to appeal from a party seeking only review of a rationale and not a reversal of a judgment could lead the opposing party to reasonably decide–as Jacqueline did here–to forgo involvement in the appeal. Indeed, the investment of time and resources to counter an appeal that will not alter the outcome of a judgment which was in that party's favor makes little sense, particularly if that party has no concern regarding the rationale supporting the judgment. Acceptance of such a practice will engender gamesmanship, as parties attempt to gain strategic advantage through the use of the appellate process. With today's opinion, the majority places its imprimatur on this practice.

As a result of allowing this appeal to proceed, the majority fully adopts the arguments advanced by the State without the benefit of hearing arguments for a different construction of this statute from the other side.[4] In our courtroom in Springfield, the motto "Audi Alteram Partem" is inscribed over the entrance, which reminds us to "Hear the other side" to ensure fairness in judicial matters. I fear that my colleagues have forgotten this principle in deciding this matter, by overruling case law that has not been contested in nearly 20 years, based upon a single-sided argument. Although there has been no adversarial testing of the State's arguments due to the manner in which it has proceeded in this case, we are nevertheless binding later courts which may have the opportunity to fully hear and test the opposing views on this issue.

---

to respond to the petitioner's petition for *certiorari*, and where that petition was granted, the Court appointed counsel to serve as *amicus curiae* in support of the judgment of the Court of Appeals below); R. Stern & E. Gressman, Supreme Court Practice §13.14, at 743 (9th ed. 2007) (it is the custom of the Court to "invite[] the *amicus* to present an argument because for some reason no other counsel would have represented that side of the case"). It is my view that such an approach is preferable over a court of permissive review entertaining argument as to only one side of a case. Indeed, adopting a custom and practice similar to that of the Supreme Court would fit well with this court's encouragement of *pro bono* service (see 210 Ill. 2d R. 756(f)).

[4]In fact, nowhere in the majority opinion is it acknowledged that this case is being decided upon a one-sided argument.

The concerns I have set forth regarding my colleagues' zeal to render an opinion in this case are further supported by the fact that the majority states that it "affirm[s] the judgment of the appellate court," but "reject[s] its conclusion that section 2–18(4)(c) of the Act applies to temporary custody hearings." Slip op. at 2. As stated, a fundamental principle of appellate law is that when an appeal is taken from a judgment of a lower court, " '[t]he question before [the] reviewing court is the correctness of the result reached by the lower court and not the correctness of the reasoning upon which that result was reached.' " *People v. Johnson*, 208 Ill. 2d 118, 128 (2003), quoting *People v. Novak*, 163 Ill. 2d 93, 101 (1994). In the instant matter, this usual procedure is turned on its head, with no reasoned basis for doing so. Further, by "reject[ing]" the appellate court's "conclusion" that the provisions in section 2–18(4)(c) of the Juvenile Court Act apply to temporary custody hearings, the majority has stripped away the sole legal basis for the appellate court's reversal of the circuit court's judgment. As a result, the majority has performed the unprecedented feat of overturning a judgment of the circuit court *absent any legal rationale for doing so*.[5]

Moreover, although I am in complete agreement with the majority's assertion that the paramount concern in these proceedings is the best interests of the children to assure that they are safe and secure in all instances, I note that by their opinion today, my colleagues do nothing to protect I.H. and M.H., the two minors involved in this proceeding. The majority determines that the appellate court's reasoning was erroneous in interpreting section 2–18(4)(c) and sets forth a new interpretation of this statutory provision which *supports* the judgment of the *circuit court*. However, by virtue of the unconventional procedural posture of this case, the majority's opinion nevertheless affirms the judgment of the appellate court, which *reverses* the circuit

---

[5]As a further example of the conundrum in which the majority finds itself, the "Conclusion" section of its opinion states that the majority "affirms" the judgment of the appellate court, but that "[t]o the extent the appellate court applied section 2–18(4)(c)'s evidentiary limitation to a temporary custody hearing, we overrule that portion of *In re M.B.*, 241 Ill. App. 3d 697 (1992)." Slip op. at 13. Note, the majority is *affirming* a judgment which is grounded in a case which it has now *overruled*.

court. In other words, the majority's opinion overturns a judgment of the circuit court which, under the analysis and reasoning contained within that same opinion, *should be affirmed*. The internal inconsistency and confusion within the majority opinion, coupled with its affirmance of a reversal of a judgment of the circuit court without any stated legal rationale which is in direct contradiction to its own holding in its opinion, further supports my decision to dissent.

It is only in the penultimate paragraph of its opinion that the majority briefly acknowledges the difficulty created by the State's position "challenging the sole rationale relied upon by the appellate court in reaching its judgment and, at the same time, asserting that the judgment of the appellate court should be affirmed." Slip op. at 12. The majority, however, quickly and unconvincingly dismisses any concerns by characterizing the State's position as a "concession of error with respect to other arguments that were raised by the mother before the appellate court but not reached in the appellate court's opinion." Slip op. at 12. Specifically, the majority "understand[s]" the State's position "to be a concession that 'the State failed to prove that a safety plan existed, that respondent understood it, or that respondent violated it.' " Slip op. at 12. Absent analysis or explanation, my colleagues "agree with and accept the State's concession" and conclude on that basis that "the judgment of the appellate court must be affirmed." Slip op. at 12.

I submit that by remodeling the arguments made by the State, the majority is treading dangerously close to acting as an advocate for the State, a role which is inappropriate for an appellate court to assume. *Illinois Department of Healthcare & Family Services v. Warner*, 227 Ill. 2d 223, 234 n.2 (2008). At no time during the course of these proceedings has the State ever "conceded error" on a point in this appeal, and this characterization of the State's position does not accurately reflect the manner in which it has litigated this case.

Accordingly, for the above reasons, I cannot join the majority opinion.